**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EQUAL EMPLOYMENT ) <br> OPPORTUNITY COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CROSSMARK, INC., ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 3:18-cv-1760 <br><br> JURY DEMAND |

## **COMPLAINT**

### NATURE OF THE ACTION

1. This action is brought under Title I of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, as amended, 42 U.S.C. § 12101 *et seq*. and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to correct unlawful employment actions on the basis of disability and to provide appropriate relief to each nationwide class member.

2. As alleged with greater particularity below, the Commission alleges that Crossmark, Inc. violated the ADA by discriminating against a nationwide class of Event Specialists (i.e., part-time food demonstrators assigned to, *inter alia*, Walmart stores and Sam's Clubs) who required a reasonable accommodation of sitting more than ten minutes every two hours, by (a) using a qualification standard and methods of administration that have the effect of discrimination on the basis of disability, and (b) failing to provide reasonable accommodations to qualified employees with disabilities.

1

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.

4. This action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference the enforcement provisions of Title VII of the Civil Rights Act of 1964 (Title VII), 78 Stat. 253, 42 U.S.C.§ 2000e *et seq.*, and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

5. Venue is proper in this Court pursuant to 42 U.S.C. § 12117(a) (incorporating Title VII's venue provisions) because the employment practices alleged to be unlawful were committed, *inter alia*, in Illinois.

## PARTIES

6. Plaintiff Equal Employment Opportunity Commission is the agency of the United States charged with the administration, interpretation, and enforcement of Title I of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e *et seq*).

7. Defendant Crossmark, Inc. is a Delaware corporation, headquartered in Texas, and licensed and doing business in Illinois (and elsewhere). At all relevant times, Crossmark has continuously been an employer with approximately 40,000 employees engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C. § 12111(5), (7); and is a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## ADMINISTRATIVE PROCEDURES

8. Eleven individual Event Specialists filed timely charges between July 2010 and September 2013 alleging violations of the ADA by Crossmark.

9. On November 29, 2011, the Commission's St. Louis District Office (SLDO) Director issued a letter to Crossmark noting "that the scope of the Commission's investigation … has been expanded to a class investigation."

10. In January 2012, the Commission transferred responsibility for investigating all related charges filed nationwide to its SLDO, regardless of where the charge was filed.

11. On June 15, 2017, after a systemic investigation, the Commission issued Crossmark a Letter of Determination (LOD) for each of the eleven charging parties finding reasonable cause to believe that it violated the ADA not only against each charging party, but also against a nationwide class of Event Specialists.

12. Each LOD also invited Crossmark to join with the Commission in informal methods of conciliation to eliminate the discriminatory practices and provide appropriate relief.

13. The Commission engaged in communication with Crossmark to provide the company the opportunity to remedy the discriminatory practices described in the LODs.

14. The Commission was unable to secure from Crossmark a conciliation agreement acceptable to the Commission.

15. On September 29, 2017, the Commission issued to Crossmark a Notice of Failure of Conciliation on all charges.

16. All conditions precedent to the institution of this lawsuit have been fulfilled.

**STATEMENT OF FACTS**

A.   Crossmark's Contract with Walmart and Sam's Club.

17.   Starting in 2008, Crossmark began contracting with Walmart, Inc. and Sam's West, Inc. (doing business as Sam's Club) to conduct in-store promotions with the objective of increasing sales.

18.   Prior to Crossmark taking over a particular Walmart or Sam's Club "in-store promotion" events, Walmart and Sam's Club had their own employees perform such duties.

19.   In many cases, those employed by Walmart or Sam's Club to work "in-store promotion" events as were hired by Crossmark as "Event Specialists."

20.   Crossmark renewed or expanded its "In-Club Promotions Agreement" multiple times, including in 2010 and 2012.

21.   A true and accurate copy of the January 2010 "Agreement" is attached as **Ex. A**.

22.   Over time, the number of Walmart stores and Sam's Clubs in which Crossmark operated has increased.

B.   Crossmark Event Specialists.

23.   As part of it contract, Crossmark provides part-time employees to *inter alia* serve as "in-store food and non-food demonstrators" (Event Specialists) to Walmart stores and Sam's Clubs nationwide.

24.   According to Crossmark's job description for Event Specialists, dated February 2010, there are twelve "Essential Duties and Responsibilities."

25.   A true and accurate copy of Crossmark's job description for "Event Specialists," dated February 2010, is attached as **Ex. B**.

26. Although not listed as an "essential duty or responsibility," the job description does list physical demands including the fact that "associate[s] will be regularly required to "[s]tand for up to 8 hours at a time." **Id**.

27. Disabled employees who were employed by Walmart or Sam's Club to work "in-store promotion" events (before being hired by Crossmark as "Event Specialists") and needed a sitting accommodation greater than ten minutes sitting every two hours were regularly granted such accommodations by Walmart and Sam's Club.

28. Walmart and Sam's Club's "In-Club Promotions Agreement" explicitly recognizes that an individual with a standing restriction but otherwise qualified to work as an Event Specialist should be provided a sitting accommodation if required by the ADA. *See* **Ex. A**, at p. 23 ("Unless required under the Americans With Disabilities Act … E[vent] P[ersonnel] shall not sit, eat, drink, smoke, read a book, or chew gum while conducting a Promotional Event. The [Event Specialist] should greet all members during an event and should be able to tell members where the product being represented is located in the club.").

C. Crossmark's Standard Stool Accommodation Policies.

29. Sometime in 2009 or 2010, Crossmark established what it called the Standard Stool Accommodation (SSA) and issued "guidelines," which stated:

> Reasonable accommodation guidelines for using a stool while working:
> - The associate is required to provide his/her own stool.
> - The stool must be 28" high from floor to seat.
> - The stool may be used for sitting up to 10 minutes during any two hour period.
> - The time using the stool is in addition to any standard breaks that may be available during a normal work day.
> - While sitting during one of the 10 minute periods, if a customer approaches the associate is required to stand, greet the customer and conduct the demo[nstration].

30. Prior to September 23, 2010, SSA guidelines were usually presented at the *end* of the notional interactive process as the maximum accommodation available to qualified individuals with disabilities who requested a sitting accommodation.

31. On or about September 23, 2010, Crossmark established and implemented a new component to its SSA – i.e., a policy and procedure in which it would *start* the notional "interactive process" by sending a non-negotiable SSA email to any employee who was a qualified individual with a disability and requested a sitting accommodation with direction to "**Please read the guidelines … and reply to this email with a Yes or No answer**, notifying CROSSMARK as to whether this accommodation is sufficient to perform the essential duties and responsibilities of your job as an Event Specialist…" (emphasis in original).

32. A true and accurate copy of Crossmark's non-negotiable SSA email is attached as **Ex. C**.

33. The genesis of Crossmark's policy and procedure of starting the notional "interactive process" by sending a non-negotiable SSA email was to create a "simplified process" with the goal of "help[ing] move [accommodation requests] along without taking much … time."

34. The result of Crossmark's policy and procedure of starting the notional "interactive process" by sending a non-negotiable SSA email was as Crossmark intended – i.e., it moved accommodation requests along without taking much time.

35. If the employee responded "yes" to Crossmark's non-negotiable SSA email, it was Crossmark's policy and practice to grant the accommodation specified in the policy (i.e., ten minutes sitting every two hours on an employee purchased stool, etc.).

36. If the employee did not respond to Crossmark's non-negotiable SSA email, it was Crossmark's policy and practice to "automatically den[y]" an accommodation. *See* Ex. C.

37. If the employee responded "no" to Crossmark's non-negotiable SSA email or articulated that a different accommodation was required (e.g., sitting for more than ten minutes every two hours), it was Crossmark's policy and practice to deny an accommodation.

38. If the employee was unable to work with a ten minute per two hour accommodation, it was Crossmark's policy and practice to terminate his or her employment.

39. Upon information and belief, Crossmark abandoned its policy and procedure of starting the notional "interactive process" by sending a non-negotiable SSA email in 2016 or 2017.

40. When Crossmark first established its SSA and "guidelines," until the policy evolved on September 23, 2010, Crossmark employees who were qualified individuals with a disability and requested a sitting accommodation were harmed by the maximum accommodation ultimately offered (i.e., ten minutes sitting every two hours).

41. The Commission received one charge from such an employee who was a qualified individual with a disability and requested a sitting accommodation and was not accommodated (having been offered only ten minutes sitting per two hours) - *Karen Simpson v. Crossmark, 510-2010-04586 (July 21, 2010).*

42. During its investigation, the Commission identified 56 additional employees who were qualified individuals with a disability, requested a sitting accommodation (from January 1, 2009, to September 22, 2010), and were harmed by Crossmark's maximum accommodation offer (i.e., ten minutes sitting every two hours).

7

43. For example, in March 2010, Ms. Rhonda Whitecotton began working at a Sam's Club in Des Plaines, Illinois, as a part-time Event Specialist.

44. Whitecotton is disabled, and has the following conditions: heart disease, diabetes, arthritis, neuropathy, and carpel tunnel syndrome.

45. During the first six months of the job, Whitecotton would sit as needed given her disabilities.

46. Whitecotton was able to perform all of the essential functions of the job (even sitting as necessary) and did so satisfactorily.

47. On August 19, 2010, Whitecotton's supervisor required that she request a reasonable accommodation to sit and she was provided a list of questions and request for a "note from [her] physician."

48. On August 30, 2010, Whitecotton submitted her responses to the questions requesting that she be "provide[d] a seat to be able to sit" as necessary.

49. Whitecotton's doctor's note said she should be able to sit and avoid "strenuous activities."

50. When pushed by Crossmark regarding "how often, and for how long [she] need[s] to sit," Whitecotton responded, "5 mins every half hour should be sufficient" (which is 20 minutes every two hours).

51. Twenty-three minutes after getting Whitecotton's email requesting to sit 20 minutes every two hours, Crossmark responded:

> We currently cannot accommodate sitting this frequently. In addition I have read your doctor's note and it says you are not to have any strenuous activities, but a requirement of the job is to push a 300 lb. cart and lift 30 lbs. At this time you will need to stop work until we can obtain a written note from your doctor and make an appropriate determination of your accommodation request.

8

52. Although Whitecotton felt that sitting "only 10 minutes every two hours was difficult" she felt she had "no choice" and must accept this limit because she desperately needed the job with Crossmark.

53. Whitecotton then contacted her physician and asked him to draft and sign a note that corresponded precisely to what Crossmark said it required.

54. Whitecotton's physician wrote and transmitted a note (dated September 2, 2010) stating:

> Because of [Whitecotton's] condition she needs to sit down 10 minutes every two hours. [She] may push a cart not weighting [sic] over 300LBS. She can periodically lift 30LBS as needed. These restrictions are in effect until further notice.

55. On September 8, 2010, Crossmark emailed Whitecotton that "[b]ased on your [new] doctor's note… you are approved to use a stool under reasonable accommodation guidelines" of "sitting up to 10 minutes during any 2 hour period."

56. Whitecotton was harmed by the accommodation granted versus the accommodation requested/needed.

57. Whitecotton tried to work within the limits of the accommodation granted but was constructively discharged in May 2011 because, *inter alia*, she was unable to do so.

58. Almost immediately after Crossmark adopted the policy and procedure (on September 23, 2010) of *starting* the notional "interactive process" by sending a non-negotiable SSA email (i.e., see "guidelines" and respond with a "yes" or a "no"), Crossmark employees were harmed and began to complain.

59. The Commission received ten such charges:

    a. *Shelly Watson v. Crossmark*, 32E-2011-00077 (November 8, 2010);

    b. *Betty Shaffer v. Crossmark*, 550-2011-00260 (December 1, 2010);

9

      c.    *Mary Ann Sawant v. Crossmark*, 16D-2011-00078 (December 30, 2010);

      d.    *Kathryne Guilfoyle v. Crossmark*, 32E-2011-00293 (February 24, 2011);

      e.    *Tanesha Harper v. Crossmark*, 531-2011-00237 (February 25, 2011);

      f.    *Aide Moran v. Crossmark*, 846-2011-39128 (April 22, 2011);

      g.    *Marilyn Prazenica v. Crossmark*, 533-2011-00651 (April 28, 2011);

      h.    *Howard Nitzberg v. Crossmark*, 846-2011-41196 (May 6, 2011);

      i.    *Talley Melear v. Crossmark*, 846-2011-44872 (June 1, 2011); and

      j.    *Kim Roubison v. Crossmark*, 560-2013-02158 (September 4, 2013).

60.    Each of the ten charging parties (CP) was a qualified individual with a disability under the ADA; each CP notified Crossmark of a need for an accommodation; Crossmark failed to engage in the interactive process with each CP (no adequate individualized assessment), instead sending each a non-negotiable SSA email; finally, Crossmark failed to provide each CP with effective reasonable accommodation to accommodate each's medical condition(s).

61.    For example, in 2003, <u>Ms. Betty A. Shaffer</u> began working at a Sam's Club in Yuba City, California doing "in-store promotion" events part-time.

62.    Shaffer is disabled and has the following conditions: arthritis in both knees, hips, and back.

63.    Sam's Club accommodated Shaffer by allowing her to use a stool as needed for six years.

64.    Shaffer was able to perform all of the essential functions of the job with the accommodation and did so exceptionally.

65.    Crossmark took over doing such events at the Yuba City Sam's Club in March 2010 and hired Shaffer.

66. After being hired by Crossmark, she continued to perform all of the essential functions of the job in an exemplary manner and still sat on her stool when needed.

67. Sometime after she was hired, she was informed that she was violating Crossmark's policy by sitting on her stool while working and could be fired.

68. Shaffer asked for the same accommodation she was given by Sam's Club.

69. Despite providing information and physician notes supporting an accommodation, supportive emails from her supervisor (i.e., noting that Shaffer "just cannot stand" for the required time but stated, "[s]he does a great job otherwise"), and pleading emails by Shaffer, Crossmark sent her the non-negotiable SSA email on November 1, 2010, with the preface, "You have been notified previously of the allowable time to use a stool, which is up to 10 minutes every 2 hours. If you are unable to follow the [SSA] guidelines [*see supra* ¶ 29 and **Ex. C**], we will not be able to continue your employment."

70. Shaffer was terminated and received her last paycheck on or about November 9, 2010.

71. In 2006, Ms. Kathryne Guilfoyle began working at a Sam's Club in Omaha, Nebraska, doing food demonstration events part-time.

72. Guilfoyle was disabled, and had the following conditions: blood clots in her legs.

73. Sam's Club accommodated Guilfoyle by providing her a stool and allowing her to use it as needed for the four years she worked for them.

74. Guilfoyle was able to perform all of the essential functions of the job with the accommodation and did so exceptionally.

75. Crossmark took over doing such events at the Omaha Sam's Club in February 2010 and hired Guilfoyle.

11

76. When hired, Guilfoyle informed Crossmark that she would need to continue using her stool as she had done working for Sam's.

77. Despite providing information and physician notes supporting an accommodation, as well as supportive emails from her supervisor (i.e., noting that Guilfoyle "is 85 years old and just a great employee," confirming that "Sam's Club… did provide her with a stool which we are still using for her," and noting that "[s]he does need to sit most of the time"), Crossmark sent Guilfoyle the non-negotiable SSA email on October 11, 2010 (just weeks after the revised policy and procedure was promulgated on September 23, 2010), with the guidance to accept (respond "yes") or reject (respond "no") Crossmark's non-negotiable accommodation (i.e., ten minutes sitting every two hours).

78. On October 31, 2010, Guilfoyle arrived at work and asked her new supervisor, "where is my stool?"

79. Her supervisor told Guilfoyle, "I'm to bring it out to you and come back and get it after ten minutes" so you won't use is more than is allowed.

80. Guilfoyle asked, "What if I sit longer?"

81. Her supervisor told her, "You will have to go home."

82. Guilfoyle was terminated the following week - November 5, 2010.

83. During its investigation, the Commission identified another 162 employees (beyond the ten charging parties – *see supra* ¶ 59) who were qualified individuals with a disability, requested a sitting accommodation (from September 23, 2010, to March 15, 2012), received Crossmark's non-negotiable SSA email, and were harmed.

84. Upon information and belief, Crossmark subjected additional employees, after March 15, 2012, to its SSA policies and procedures.

## COUNT I
## ADA – Illegal Policies and Procedures
## 42 U.S.C. § 12112(a), (b)

85. The Commission repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint (¶¶ 1-84) as fully set forth herein.

86. Crossmark's requirement that individuals be able to stand for eight hours at a time, along with its SSA guidelines that permit some individuals to sit on a stool for no more than ten minutes every two hours, constitutes a qualification standard as defined under the ADA that unlawfully screens out or tends to screen out individuals with disabilities.

87. Crossmark's use of its qualification standard and methods of administration had the effect of discriminating against each of the eleven charging parties (see *supra* ¶¶ 41, 59), 218 additional employees identified during the Commission's investigation (*see supra* ¶¶ 42, 83), and others (*see supra* ¶ 84) (collectively "class members").

88. Crossmark's unlawful establishment and maintenance of its qualification standard and methods of administration was intentional. 42 U.S.C. § 1981a.

89. Crossmark's unlawful establishment and maintenance of its qualification standard and methods of administration was done with malice or reckless indifference to the federally protected rights of each class member. 42 U.S.C. § 1981a.

90. As a direct and proximate cause of Crossmark's unlawful use of its qualification standard and/or methods of administration each class member suffered damages.

## COUNT II
## ADA – Failure to Accommodate
## 42 U.S.C. § 12112(a), (b)(5)

91. The Commission repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint (¶¶ 1-90) as fully set forth herein.

92. Each class member was a qualified individual with a disability under the ADA.

93. Each class member made known to Crossmark his or her physical limitations and requested a sitting accommodation under the ADA.

94. Crossmark subjected class members to its qualification standard and SSA policies and procedures.

95. Crossmark did not provide reasonable accommodations to the known physical limitations of each class member in violation of the ADA. 42 U.S.C. § 12112(b)(5).

96. Crossmark's failure to provide reasonable accommodations to the known physical limitations of each class member was intentional. 42 U.S.C. § 1981a.

97. Crossmark's failure to provide reasonable accommodations to the known physical limitations of each class member was done with malice or reckless indifference to the their federally protected rights. 42 U.S.C. § 1981a.

98. The effect of Crossmark's failure to provide reasonable accommodations to the known physical limitations of each class member was to deprive each class member of equal employment opportunities and otherwise adversely affect his status as an employee because of his disability including but not limited to discharge and constructive discharge.

99. As a direct and proximate cause of Crossmark's failure to provide reasonable accommodations to the known physical limitations of each class member, each suffered damages.

**PRAYER FOR RELIEF**

A. Enter **declaratory judgment** pursuant to 28 U.S.C. § 2201(a) that Crossmark violated 42 U.S.C. § 12112 by establishing and maintaining its *Standard Stool Accommodation* standards, policies, and procedures.

B. Grant a **permanent injunction** enjoining Crossmark, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from discriminating against qualified individuals on the basis of disability, in violation of 42 U.S.C. § 12112;

C. Order Crossmark to make each class member whole by providing **back wages** and all appropriate c**ompensatory damages**, as well as prejudgment interest, for its acts complained of above;

D. Order Crossmark to pay each class member **punitive damages** for its acts complained of above;

E. Grant such **other and further relief** as this Court deems necessary and proper in the public interest; and

F. Award the Commission its **costs** of this action.

    Respectfully submitted,

    JAMES L. LEE
    Deputy General Counsel

    GWENDOLYN YOUNG REAMS
    Associate General Counsel

    /s/ Andrea G. Baran
    ANDREA G. BARAN, MO #46520
    Regional Attorney
    Email: andrea.baran@eeoc.gov

/s/ C. Felix Miller
C. FELIX MILLER, MO #28309
Supervisory Trial Attorney
Email: felix.miller@eeoc.gov

/s/ Jennifer Arendes
JENNIFER ARENDES, MO #46638
Senior Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
St. Louis District Office
1222 Spruce St., Room 8.100
St. Louis, MO 63103
Phone: (314) 539-7916
Fax. (314) 539-7895
Email: grant.doty@eeoc.gov

/s/ Grant R. Doty
GRANT R. DOTY, MO #60788
Senior Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
St. Louis District Office
1222 Spruce St., Room 8.100
St. Louis, MO 63103
Phone: (314) 539-7918
Fax. (314) 539-7895
Email: grant.doty@eeoc.gov